**GEORGIA ASSOCIATION OF RETARD-ED CITIZENS, et al., Plaintiffs-Appellees, Cross-Appellants,**

v.

**Dr. Charles McDANIEL, etc., et al., Defendants-Appellants, Cross-Appellees.**

No. 81–7485.

United States Court of Appeals, Eleventh Circuit.

Oct. 17, 1983.

Rehearing and Rehearing En Banc Denied Dec. 2, 1983.

Alfred L. Evans, Jr., Senior Asst. Atty. Gen., Atlanta, Ga., for defendants-appellants, cross-appellees.

Fisher & Phillips, Griffin B. Bell, Jr., Ruth W. Woodling, Atlanta, Ga., for Savannah Chatham Bd. of Educ.

Jonathan A. Zimring, Atlanta, Ga., Rose Firestein, Ga. Legal Service Program, Savannah, Ga., for plaintiffs-appellees, cross-appellants.

Before HILL and VANCE, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

In this controversy, we are asked to determine whether plaintiff Russell Caine, a profoundly mentally retarded child, and members of the certified class are entitled, under applicable federal statutes and regulations, to more than 180 days of public education in Georgia each year upon a showing of need. Plaintiffs contend, and the district court found, 511 F.Supp. 1263, that the defendants refused as a matter of policy to consider or provide such education in all cases. The court also determined that this policy results in regression in the training of profoundly and severely mentally retarded children. We conclude that the district court's findings are supported by the record and that the refusal to consider or provide year round educational programs is contrary to the defendants' obligations under the Education for All Handicapped Children Act and § 504 of the Rehabilitation Act of 1973 to provide a free public

education serving each handicapped child's particular needs.

## I. Background

Defendants, comprising the Georgia Superintendent of Schools, the Georgia State Board of Education and that Board's individual members ("state defendants"), and the Superintendent of the Savannah-Chatham School System, the Savannah-Chatham Board of Education and its individual members ("local defendants"), appeal from a judgment of the United States District Court for the Northern District of Georgia enjoining the policy by which the defendants do not consider or provide more than 180 days of education for profoundly and mentally retarded ("PSMR") children. Defendants challenge the district court's findings of fact and conclusions of law. Plaintiffs, who are Russell Caine, a PSMR child, his parents, L. Douglas and Virginia Caine, the Georgia Association of Retarded Citizens ("GARC")[1] and two classes composed of (1) all handicapped school aged children in Georgia who are mentally retarded and require more than 180 days of public school programming and (2) the parents and guardians of these children, cross-appeal from the district court's order failing to reach a determination of specific need for Russell Caine and other individual PSMR children. The plaintiffs also challenge the lack of specificity of the district court's injunction.

In early 1978, the Caines appealed the decision of the Savannah-Chatham County Board of Education denying their son placement in a full year educational program. Russell Caine, nine years old at the time this suit was filed, had a mental age of two. As with most other PSMR children, he required training in basic living skills, including walking, feeding, and toilet use. On April 18, 1978, an administrative hearing was held before the Chatham County Hearing Review Board, affirming the School Board's decision. An appeal to the State

Board of Education in May, 1978, similarly produced an adverse ruling. The Caines filed this action in November, 1978, challenging the Board's decision under the Education for All Handicapped Children Act ("the Act" or "the Handicapped Act"), 20 U.S.C. § 1401 et seq., § 504 of the Rehabilitation Act of 1973 ("§ 504"), 29 U.S.C. § 794, the equal protection and due process clauses of the Fourteenth Amendment of the Constitution, and under the Georgia Constitution and the Adequate Program for Education in Georgia Act, Georgia Code Annotated § 32–601a et seq.

In June, 1979, the district court held an evidentiary hearing on plaintiff's motion for preliminary injunction and class certification. The district court determined that plaintiffs did not show irreparable injury and that it would not be in the public interest to grant a preliminary injunction. The court certified two separate classes of plaintiffs. The first class is composed of "all handicapped children of school age in the state of Georgia who are mentally retarded, and who because of their special needs, require more than 180 days of public school programming of special education and related services." The second class is composed of all parents or guardians of all children in the first class.

The case was tried on the merits without a jury during the summer of 1980. The district court rendered its opinion on April 2, 1981, granting an injunction against the challenged policy but refusing to require specific educational placement for any of the children. After oral argument on appeal, we received briefs from the parties assessing the impact of the Supreme Court's decision in Board of Education of the Hendrick Hudson Central School District v. Rowley, 458 U.S. 173, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). We then solicited the parties' views on the procedural appropriateness of an apparent attack by a private party on the state plan brought under 20 U.S.C. § 1415(e)(2) as a challenge

---

1. The GARC is a non-profit state wide organization created to promote the interests of mentally retarded citizens of all ages.

to an individualized education program. We also requested advice from the Secretary of Education on his role in such a suit and entertained a brief from the United States as *amicus curiae.* We first outline the Handicapped Act's mandates, the primary statute under which this suit was brought, as interpreted by *Rowley,* so as to be on firm footing in addressing the procedural questions we posed to counsel. We next turn to the substance of the defendant's contentions on appeal, and lastly to the issues presented on cross appeal.

## II. The Handicapped Act

■ Congress intended, by adopting the Handicapped Act, to encourage and assist the provision of a free and appropriate education by the states to all handicapped children. The Act was passed in response to Congress' perception that most handicapped children in the nation "were either totally excluded from schools or [were] sitting idly in the regular classrooms awaiting the time when they were old enough to 'drop out'." House of Representatives Report No. 94–332, p. 2 (1975). The Act is a model of "cooperative federalism" in that it offers funds in exchange for the acceptance of certain standards for the education of handicapped children. This case arises from the proper interpretation and application of those standards.

An analysis of the Act must be bottomed on the central role states play in educating their citizens. The Supreme Court has recognized that:

No single tradition in public education is more deeply rooted than local control over the operation of schools; local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to quality of the educational process. Thus, in *San Antonio School District v. Rodriguez,* we observed that local control over the educational process affords citizens an opportunity to participate in decisionmaking, permits the structuring of school programs to fit local needs, and encourages 'experimentation, innovation,

and a healthy competition for educational excellence'.

*Milliken v. Bradley,* 418 U.S. 717, 741–42, 94 S.Ct. 3112, 3125, 41 L.Ed.2d 1069 (1974). (Cites omitted). *See also San Antonio School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 19 (1973).

Yet a state's responsibility for providing education is bounded by certain congressionally developed concerns once the state accepts federal financial assistance under the Act. Federal delimitations upon state educational programs for the handicapped reflect two core principles: first, that each handicapped child's education must be carefully crafted to meet that child's individual needs so that the child may benefit from his or her education; and second, that states must adopt extensive due process procedures to insure that substantive individual needs are met. The statutory requirement of an "appropriate" education draws its content from these principles.

The central requirement a state receiving federal funds under the Handicapped Act faces is to effect a "policy that assures all handicapped children the right to a free appropriate public education." 20 U.S.C. § 1412(1). The Act plainly provides that such an education must be uniquely suited to each handicapped child's needs. The Act defines free appropriate public education as:

*Special Education* and related services which (A) have been provided at public expense under public supervision and direction, and without charge, (B) meet the standards of the state educational agency, (C) include an appropriate pre-school, elementary, or secondary school education in the state involved, and (D) are provided *in conformity with the individualized education program* required under § 1414(a)(5) of this title.

20 U.S.C. § 1401(18) (emphasis added). Moreover, the Act defines "special education" as a program of instruction which is "*specially designed ... to meet the unique needs* of a handicapped child." 20 U.S.C. § 1401(16) (emphasis added). "Related services" are "such developmental, correc-

tive, and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, and medical and counseling services ...) as may be required to assist a handicapped child to benefit from special education ..." 20 U.S.C. § 1401(17).

■ In addition, the Act so clearly delineates the "individualized education program" ("IEP") which must be developed for each handicapped child that there can be no question under the statute that the State is responsible for meeting a child's *unique* educational needs. The IEP is to be developed as a written statement for each handicapped child in a meeting between the teacher, parents or guardian, and local educational agency representative. The statement must include a discussion of: the child's present level of performance; annual goals and short-term instructional objectives; the specific educational services to be provided to the child; the extent to which the handicapped child is able to participate in regular educational programs; the projected date of initiation and duration of the services; and the means for determining whether the instructional objectives are being met. 20 U.S.C. § 1401(19).

The IEP is more than a mere exercise in public relations. It becomes the basis for a handicapped child's entitlement to an education in conformance with the IEP, 20 U.S.C. § 1401(18)(D), and for a host of procedural rights in the event a child's education deviates from a mutually arrived upon IEP. Thus, parents are entitled under the Act to written prior notice whenever an educational agency proposes or refuses to initiate a change in the evaluation or educational placement of their child or the provision of a free appropriate public education to a handicapped child. 20 U.S.C. § 1415(b)(1)(C). Parents or guardians are to be afforded an impartial due process hearing before, at least in the last adminis-

trative resort, the state educational agency, 20 U.S.C. § 1415(b)(2) and 20 U.S.C. § 1415(c), complete with all the requisite rights of a full trial. 20 U.S.C. § 1415(d)(2) [Counsel or other qualified advisors; present evidence; cross-examine; compel attendance of witnesses; record of hearing; and written findings of fact and decision]. Finally, parents have a right to appeal a decision of the state educational agency to a United States district court, which shall hear such additional evidence necessary to engage in a *de novo* resolution of the complaint. 20 U.S.C. § 1415(e)(2), (4).

In addition, the Act requires that each state adopt a plan assuring, *inter alia,* that all federal funds will be spent in a manner consistent with the provision of a free appropriate public education to all handicapped children in the state. 20 U.S.C. § 1413(a)(2). The Commissioner of Education (the "Commissioner") is required to review all state plans and approve only those providing such assurances.[2] 20 U.S.C. § 1413(c). The Commissioner is empowered with authority to terminate federal funding under the Act, after reasonable notice and the opportunity for a hearing, should he or she determine that a state has failed to meet its statutory obligations. 20 U.S.C. § 1416(a). The Commissioner's decision is reviewable in the United States Court of Appeals for the circuit in which the objecting state is located. 20 U.S.C. § 1416(b).

In *Rowley,* the Supreme Court determined that an eight year old deaf child who could read lips well, was advancing easily from grade to grade, and performed better than the average child was not entitled to a sign—language interpreter. In construing the Act's requirement of an "appropriate" education, the Supreme Court rejected the argument that states must provide "a potential-maximizing education." *Rowley,* 102 S.Ct. at 3046 n. 21. The Court declined to impose any particular substantive stan-

**2.** The responsibilities of the United States Commissioner of Education were transferred to the Secretary of Education with the Department of Education Organization Act, Public Law No. 96–88, 96th Congress, 1st Session (1979). See

*20* U.S.C. § 3441. The regulations governing implementation of the Handicapped Act, originally codified in title 45 CFR were recodified at 34 CFR Part 300 after the creation of the Department of Education.

dard on the states, but noted that implicit in the Act was the principle that a handicapped child's education must confer some benefit upon that child. *Id.* 102 S.Ct. at 3048. The Court did, moreover, identify a "basic floor of opportunity" provided by the Act, which "[c]onsists of access to specialized instruction and related services which are *individually designed* to provide educational benefit to the handicapped child." *Id.* 102 S.Ct. at 3049 (emphasis added). The Court emphasized that such instruction and services must comport with the child's IEP. *Id.*

Based upon this interpretation of the Act, the Supreme Court delineated the appropriate scope of review for a court faced with a challenge to state educational decisions. According to the Court,

> a court's inquiry in suits brought under § 1415(e)(2) is two-fold. First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

*Rowley,* 102 S.Ct. at 3051 (footnote omitted).

Notably, the Court also directed that the first prong of this inquiry, whether the State has complied with the Act's procedures, "will require a court not only to satisfy itself that the State has adopted the state plan, policies, and assurances required by the Act, but also to determine that the State has created an IEP for the child·in question which conforms with the require-

ments of § 1401(19)." *Id.* 102 S.Ct. at 3051 n. 27.

### III. Procedural Prerequisites

Having developed an understanding of the statutory scheme Congress devised to assist states in educating handicapped children, we shall apply the Supreme Court's guidelines to our review of the adequacy of Georgia's compliance with the Act. However, we first address certain threshold procedural questions raised by the defendants that go to this Court's power under the Constitution to render an opinion in this case.

▮▮▮▮ The defendants asserted at oral argument that this case is moot because named plaintiff Russell Caine no longer resides in Chatham County and the Court therefore may no longer provide him any relief. Defendants fail to realize that the action still presents a "live controversy" as to the unnamed class members. Upon certification the class attained a legal status distinct from Russell Caine's asserted interest in the law suit. This interest continues today and is evidenced by the vigorous efforts with which the arguments of the class have been urged during these proceedings. *See Franks v. Bowman Transportation Company,* 424 U.S. 747, 752–55, 96 S.Ct. 1251, 1258–60, 47 L.Ed.2d 444 (1976) (employment discrimination class action); *Sosna v. Iowa,* 419 U.S. 393, 397–403, 95 S.Ct. 553, 556–59, 42 L.Ed.2d 532 (1975) (class action challenging residency durational requirement for divorce.). *See also Goosby v. Osser,* 409 U.S. 512, 514 n. 2, 93 S.Ct. 854, 856 n. 2, 35 L.Ed.2d 36 (1973); *Sands v. Wainwright,* 491 F.2d 417 (5th Cir.1973) (en banc).[3]

---

**3.** The defendants also challenge the propriety of certification of the plaintiff classes due to alleged indefiniteness of the composition of these classes. Our determination that the case is not moot inherently relies upon the appropriateness of the class certification. The district court certified a class of all handicapped school aged children in Georgia who are mentally retarded and require more than 180 days of public school programming. The court certified a second class consisting of the parents or guard-

ians of children in the first class. Defendants contend that, because the class definitions themselves are premised upon findings of need, the classes are inherently indefinite and therefore impermissible.

Defendants' argument here is without merit. "It is axiomatic that the decision to or not to certify a class is discretionary, and the determination of the trial court should stand absent an abuse of discretion, assuming that the court acts within the parameters of Federal Rule Civ-

Defendants also claim that the district court rendered a purely advisory opinion due to the absence of a case or controversy. Defendants argue that the district court explicitly found that the plaintiffs failed to show sufficient identifiable injury to warrant the issuance of a mandatory injunction. The district court concluded, however, that the plaintiffs did suffer injury in fact due to the existence of a statewide policy precluding consideration *on the merits* of the need for more than 180 days of education per year in a handicapped child's IEP. The court's findings in this regard and its direction that the appropriate state or local educational agency determine each child's educational needs without limitation, establishes the existence of an adequate case or controversy. The district court clearly found a procedural injury. Moreover, the court's refusal to find a substantive injury arguably resulted from the failure of the State to insure that the proper procedures required under the Act were met. The court's disposal of this action falls within the broad remedial discretion afforded a district court judge under the Act. *See* 20 U.S.C. § 1415(e)(2) ("the court ... shall grant such relief as the court determines is appropriate.")

Defendant's argument simply misconstrues the requirements of Article III of the Constitution. It confuses the sufficiency of proof with the adequacy of an asserted interest. Plaintiffs have claimed injury in fact and thus have standing to bring this law suit. It is unnecessary to decide wheth-

er plaintiff's allegations of harm due to the existence of a state policy will *ultimately* entitle them to any relief in order to hold that there is a sufficient controversy here. "If such impairment does produce a legally cognizable injury, [plaintiffs] are among those who have sustained it." *Baker v. Carr,* 369 U.S. 186, 208, 82 S.Ct. 691, 705, 7 L.Ed.2d 663 (1962). There is no doubt that the plaintiffs have "*alleged* such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends." *Baker,* 369 U.S. at 204, 82 S.Ct. at 703 (emphasis added).

## IV. Statutory Procedural Concerns

After hearing oral argument in the instant action, this Court directed the parties to respond to certain questions dealing with the propriety of a challenge to a purported state policy in the context of a § 1415 request for review of a particular child's IEP. We are now fully satisfied with the appropriateness of the procedures employed by the plaintiffs.

There is no statutory provision by which a concerned parent may challenge a state plan once it has been formulated.[4] While the Commissioner of Education is entitled to disapprove a state plan and cut off the flow of federal funds to the state, 20 U.S.C. § 1413(c), there is no provision for parental intervention in that process.[5]

---

il Procedure 23." *Walker v. Jim Dandy Company,* 638 F.2d 1330, 1334 (5th Cir.1981). *See also Zeidman v. J. Ray McDermott and Company,* 651 F.2d 1030, 1038 (5th Cir.1981); *Boggs v. Alto Trailer Sales, Inc.,* 511 F.2d 114 (5th Cir.1975); *Hill v. American Airlines, Inc.,* 479 F.2d 1057 (5th Cir.1973); 7A C. Wright and A. Miller, Federal Practice and Procedure § 1785, 134–135 (1972). We are unable to find such an abuse of discretion here, "since it is not necessary that the members of the class be so clearly identified that any member be presently determined." *Jones v. Diamond,* 519 F.2d 1090, 1100 (5th Cir.1975). *See Carpenter v. Davis,* 424 F.2d 257, 260 (5th Cir.1970), *Bailey v. Patterson,* 323 F.2d 201 (5th Cir.1963), *cert. denied,* 376 U.S. 910, 84 S.Ct. 666, 11 L.Ed.2d 609 (1964); *Ladd v. Dairyland County Mutual In-*

*surance Company of Texas,* 96 F.R.D. 335 (N.D. Tex.1982). *Also see Battle v. Pennsylvania,* 629 F.2d 269 (3d Cir.1980), *cert. denied* 452 U.S. 968, 101 S.Ct. 3123, 69 L.Ed.2d 981 (1981).

4. 20 U.S.C. § 1412(7)(B) requires a state to provide the general public with notice, an opportunity for comment, and public hearings prior to the adoption of a state plan. Once adopted, however, there is no provision for challenging that plan.

5. Defendants claim that 20 U.S.C. § 1231b–2 establishes the requirement of administrative exhaustion by providing a means to challenge the Commissioner of Education's approval of a plan. We disagree. That provision is part of the general statutory requirements governing

Even if a citizen arguably may institute such a procedure by complaint, the Commissioner could decline to investigate due to the lack of enforcement resources rather than due to any determination on the merits. *Cannon v. University of Chicago,* 441 U.S. 677, 706–08, 99 S.Ct. 1946, 1962–63, 60 L.Ed.2d 560 (1979). Moreover, the availability of intervention in fund termination procedures fails to provide a means for plaintiffs to vindicate their rights by procurement of appropriate educational services. *See New Mexico Ass'n. for Retarded Citizens v. State of New Mexico,* 678 F.2d 847, 851 (10th Cir.1982); *Pushkin v. University of Colorado,* 658 F.2d 1372, 1381 (10th Cir.1981). Even if procedure for intervention did exist, we are unconvinced plaintiffs would be required to employ it where, as here, that which is under attack became known only upon subsequent proceedings and is not apparent from the face of the plan itself.

■ There is nothing in 20 U.S.C. § 1415(e)(2) to suggest that the due process rights of a parent under the Act are to be curtailed merely because the challenge to the IEP happens to implicate a portion of a state's plan. We do not find that approval of Georgia's state plan by the Commissioner creates any presumption as to the legality of the 180 day policy found by the district court. The plan is silent as to the duration of services to be provided handicapped children. Moreover, the plan does provide that "[f]or agencies conducting *twelve month* educational programs, the school year begins October 1 and ends September 30 for the purpose of IEP's" (emphasis added). Thus, the plan may well have suggested to the Commissioner, who reviewed it without the benefit of knowledge of the State's actual practice, that the State would indeed consider year round schooling when shown to be necessary. We also decline to require as a matter of law that a party bringing a claim under § 1415 join the Commissioner of Education in the proceedings. There is

no basis in the statute or the regulations for such a procedure. Requiring joinder of the Commissioner would impinge upon a district court's discretion in managing litigation and does not appear to be necessary under Federal Rules of Civil Procedure 19. Nor would it serve any valuable purpose for it would involve the Commissioner in numerous suits in which he or she had only minimal policy interest and in which the Commissioner would not be in a position to offer any form of relief.

## V. District Court's Findings of Fact

The district court explicitly found that the state and local defendants have a policy of limiting education for handicapped children to 180 days per year. The court also determined that PSMR children regressed as a result of the three month summer break in their training. Defendants challenge these factual findings.

■ As a preliminary matter, we must determine the appropriate standard of review of these findings. Defendants urge that the finding of a state-wide policy of nine month's education is an "ultimate fact" that may be overturned on review on the basis of mere error. Federal Rules of Civil Procedure 52(a), however, mandates that "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Last year, the Supreme Court made clear that the former Fifth Circuit was· unjustified under Rule 52(a) in dividing findings of fact between "subsidiary" and "ultimate" issues and then applying a more stringent standard of review to the latter. *Pullman-Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982). Rather, any factual "finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction ·that a mistake has

federal education programs and is not part of the Handicapped Act. Moreover, it is designed to permit "applicants" or "recipients" of funds, meaning local school districts and *not individu-*

*als,* to appeal adverse funding decisions in federally funded state programs. It creates no requirements for parties attacking policies inherent in all IEP's promulgated within a state.

been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

A review of the record provides ample support for the district court's conclusion that the local defendants had a policy of not providing more than 180 days education to handicapped children. The local defendants point to several factors weighing against this conclusion. First, they argue that the professional staff of the Exceptional Children's Center ("ECC"), the facility Chatham County operates for PSMR children, unanimously testified to the lack of need for more than nine months education for all the children under consideration in this suit. The local defendants thus claim that they engaged in the requisite individualized determinations. Further, the local defendants point out they indeed sent one child to a summer program. Also, they claim not to have discussed the duration of Russell Caine's program in IEP meetings with his parents because the issue was in litigation.

These arguments are simply unpersuasive. The district court discounted the testimony of the ECC staff because the court refused to believe that not a single child demonstrated need for extended educational placement. Rather, the court was properly convinced that the determination represented a policy decision imposed on and carried out by the EEC staff. We are not at liberty to reassess the district court's obvious credibility choices in this regard. The response of the local defendants to interrogatory # 14 confirmed the fact that the county had a policy of providing only 180 day schooling. Moreover, the fact that the local defendants consistently failed to justify refusals to provide year round education on the ground of lack of funding rather than on lack of need strongly supports the existence of such a policy. The failure to discuss Russell Caine's needs in this regard may not be attributed to pending litigation when the meetings under consideration took place even before the Caines

filed an administrative appeal. The sole exception the local defendants can muster, that of a mentally retarded child sent to a summer program for emotionally disturbed children, involved a placement decision made apart from the proceedings mandated by the Act.

Strong evidence of the local defendants' restrictive policy convinces us of the correctness of the district court's decision. The Chatham County Hearing Review Board's (the "Board") decision on Russell Caine's appeal stated:

> Evidence indicated that *there is a need for a continuous program to optimally meet Russell Caine's needs, however, State Law does not provide a funding pattern that will allow local education agencies to operate beyond the 180 day school year ... It is not the responsibility of this Hearing Review Board to decide what might be ultimately appropriate and desirable for a student* but rather, if what is being offered is appropriate and adequate under the requirements of the law ...

(emphasis added). Thus, despite the existence of evidence indicating need of a continuous program, the Board simply refused to consider whether education for more than nine months would be appropriate for Russell Caine. Rather, the Board relied upon the existence of a perceived *State* requirement to dispose of plaintiff Caine's challenge to his IEP. It is beyond peradventure then, that the Board adopted this view of "State Law" as a local policy which allowed the Board to ignore totally the plain facts showing some need for extended education on the part of Russell Caine.

The record also does not leave sufficient doubt to conclude that the district court erred in determining that there is a State policy of limited schooling for handicapped children.[6] The state defendants assert that the state plan is permissive on this question. Yet evidence that the State on appeal has

---

**6.** The State's policy is crucial because the Handicapped Act imposes the ultimate responsibility for compliance with the state educational agency. 20 U.S.C. § 1414(d). The state

agency must administer funds and services *directly* if it determines that the local educational agency is failing to provide appropriate programs.

*never* ordered a local board to provide or even consider handicapped student's needs in excess of 180 days is highly persuasive to the contrary. The State has made clear its refusal to pay for handicapped training in excess of the nine month school year. Thus, we agree with the assessment of the district court that "[t]he State defendant's policy, although neutral on its face, has the effect of prohibiting the consideration of a child's needs beyond 180 days."

Plaintiffs' case is premised on the notion that PSMR children regress after a summer break and that home training cannot equal that offered by professionals. Evidence given by the defendants and plaintiffs conflicted sharply on the degree of regression and the speed of recruitment of lost skills. Discounting the major evidence offered by the defendants in this regard as of "doubtful probative value," [7] the district court found that PSMR children, whose training so often involves basic living skills, do indeed experience some regression during breaks in their formal education.[8] We hesitate to reverse the district court where its findings so clearly rest on credibility choices among conflicting experts.

The state defendants offered three rationales for not providing year round education: first, that children need a break from a structured environment to "recharge their batteries" and become motivated to learn again; second, that children need to apply their learned skills in new situations; and third, that children benefit from informal learning. These rationales are not particularly relevant to the factual finding in question; they rather serve as a justification for permitting some regression in light

of the asserted benefits of a summer break. When the defendants do address the district court's finding on regression, they fail to muster a worthy argument. Defendants first assert that all students regress, so that the finding is of no consequence. In addition, they claim that PSMR children do not show sharp signs of the regression-recoupment syndrome that are severe enough to render nine month placement inappropriate. Next, however, they claim that there is no evidence PSMR children regress *at all.* These arguments encapsulate the deficiencies inherent in the defendant's position in this entire proceeding; the defendants justify across the board findings applicable to all PSMR children rather than recognize the need to engage in individual considerations for each child's particular needs. Their wholesale approach to assessing the "facts" of the case is precisely what constitutes an impermissible policy under the Handicapped Act.[9]

## VI. District Court's Analysis of the Law

### A. The Handicapped Act

The district court concluded that any State policy which prohibits or inhibits full consideration of the particular educational needs of each handicapped child violates the individually-oriented focus of the Handicapped Act. We recognize that the Supreme Court has stated "[t]hat the intent of the Act was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." *Rowley,* 102 S.Ct. at 3043. Nonetheless, after a careful review of the statutes and the relevant precedents, we are left with the abid-

---

**7.** The defendant offered extensive evidence of "portage studies" used to assess mental age and progress in a wide variety of skills. The district court found these to be teaching tools and not designed to measure regression, and also found that the technique was subject to inconsistent application.

**8.** The court declined to find that the evidence of regression was strong enough as to any particular child to merit the issuance of a mandatory injunction requiring additional services.

**9.** Moreover, defendants ignore the statements of the Chatham County Hearing Review Board itself that, "evidence indicated there is a need for a continuous program to optimally meet Russell Caine's needs . . ."

Without implying that the defendants must "optimally" provide for a handicapped child's needs, we do note the inconsistency of the Review Board's statement with defendants' failure throughout the course of this appeal to concede the existence of any detrimental regression on the part of PSMR students.

ing opinion that the State failed both prongs of the inquiry *Rowley* mandates. Not only did the State not follow the procedures set forth in the Handicapped Act, but by completely ignoring a crucial factor in the assessment of appropriateness, it also failed to develop IEPs for the plaintiffs that were reasonably calculated to enable all handicapped children in Georgia to receive educational benefits. The district court thus did not err in granting relief under the Handicapped Act.

The two core concerns of the Act, as analyzed in part II. *supra,* are the procedures designed to insure particularized education to individual needs and the consequent development of an IEP for each child which incorporates his or her special needs. The State's avoidance of the impact of durational consideration squarely abrogates these fundamental principles. This holding, by itself, does not impose a substantive standard on the state; it requires no more than that the state *consider* the need for continuous education, along with a range of other concerns, when developing a plan of education and related support services that will benefit a handicapped child. That the end *result* of such a consideration may be an arguably substantive decision to impose a year round education in certain cases, whether voluntarily imposed by the state or by a § 1415(e)(2) federal court sitting in review, does not violate the role reserved to states under the Act. The substantive requirement may be met by more sensitive and accurate IEPs and by a recognition of the procedural imperatives that give attention to individual needs, both being goals which Congress unquestionably sought to impose upon the states in educating handicapped children.

The Third Circuit in *Battle v. Pennsylvania,* 629 F.2d 269 (3d Cir.1980), *cert. denied,* 452 U.S. 968, 101 S.Ct. 3123, 69 L.Ed.2d 981 (1981), reached the same conclusion we do. The *Battle* court anticipated the Supreme Court's requirement of "reasonableness" in an IEP and the *Rowley* Court's attention to the procedural requirements of the Act. The court in *Battle* reasoned:

Rather than ascertaining the reasonable educational needs of each child in light of reasonable education goals and establishing a reasonable program to attain those goals, the 180 day rule imposes with rigid certainty a program restriction which may be wholly inappropriate to the child's educational objectives. This the Act will not permit.

*Battle,* 629 F.2d at 280. In a post-*Rowley* decision, the Court of Appeals for the Fifth Circuit agrees in full with the Third Circuit and our reasoning here. In *Crawford, et al. v. Pittman, et al.,* 708 F.2d 1028 (5th Cir. 1983), the court reversed the district court's judgment which had held that the Act governed only the kind and quality of services the State is required to provide to handicapped children, and not the extent of such services. The court held:

We conclude that Mississippi's policy of refusing to consider or provide special education programs of a duration longer than 180 days is inconsistent with its obligations under the Act. Rigid rules like the 180-day limitation violate not only the Act's procedural command that each child receive individual consideration but also its substantive requirements that each child receive some benefit and that lack of funds not bear more heavily on handicapped than nonhandicapped children. (footnote omitted).

Similarly in *Yaris v. Special School District of St. Louis County,* 558 F.Supp. 523 (D.E. D.Mo.1983) (memorandum opinion), the court reasoned that any policy which inhibits consideration of the individual educational needs of handicapped children necessarily conflicts with the Act's emphasis on individualized education and the requirement of an IEP. *Accord, Garrity v. Gallen,* 522 F.Supp. 171 (D.N.H.1981). *But see, Bales v. Clarke,* 523 F.Supp. 1366 (E.D.Va. 1981).

Defendants argue that congressional silence on durational requirements in the Act should be interpreted as a recognition of the "traditional" nine month school year. This argument makes little sense. First, the nine month school year is a tradition of

only recent vintage, if it may even be classified as such. Many states, including Georgia, have had, and may be expected to continue to have, other than nine months of public schooling for non-handicapped children. Second, Congress did not undertake in the Act to delineate *all* substantive considerations that compose an "appropriate education." Indeed, in light of the extraordinarily wide range of physical, mental and emotional impediments that qualify one for special treatment under the Act,[10] Congress could have hardly been expected to specify a uniform school term. Third, Congress has indicated its ability to accommodate special state concerns in the Act. For example, in determining eligibility under the Act, Congress recognized a local practice by making optional the provision of education from the ages of 3 to 5 and 18 to 21.[11]

Had Congress intended to defer to state durational practices as well, there is no doubt it easily could have done so.

Defendants also argue that the Supreme Court's decision in *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), mandates rejection of imposing the non-statutory standard of a durational requirement upon the states. In *Pennhurst,* the Court held that Congress did not intend to impose enforceable obligations on states through the Developmentally Disabled Assistance and Bill of Rights Act of 1975, 42 U.S.C. § 6000, *et seq.* ("DDAA"). The Court reasoned that Congress did not provide for a predicate receipt of federal funds upon compliance with DDAA. The Court forwarded a distinction between statutes enacted under § 5 of the Fourteenth Amendment, which

impose absolute obligations upon the states, and statutes drawn under the Spending Clause which may impose unambiguous conditions upon a grant of federal funds. Conditions imposed under the Spending Clause must attach by the terms of the statute to become an enforceable obligation:

> The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract' . . . . There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.

*Pennhurst,* 451 U.S. at 17, 101 S.Ct. at 1540 (cites omitted).

[11] Defendants implicitly concede that Congress has the authority under the Spending Clause to impose conditions that attach upon the receipt of federal funds offered under the Handicapped Act. Nonetheless, they claim that a durational requirement was absent from the statute's explicitly required "contract" terms. We disagree. *Pennhurst* is simply inapposite to the situation in the instant case. Defendants confuse the notion of ambiguity with Congress' conscious and clear effort to instill the Handicapped Act with the flexibility necessary to attend to the educational needs of individual children. Congress did not specify the myriad factors which make training for a handicapped child appropriate. There can be no question, however, that a state accepting federal funds under the Act should be fully aware of the re-

---

10. 20 U.S.C. § 1401(1) provides that " 'handicapped children' means mentally retarded, hard of hearing, deaf, speech impaired, visually handicapped, seriously emotionally disturbed, orthopedically impaired, or other health impaired children, or children with specific learning disabilities, who by reason thereof require special education and related services."

11. Section 1412(2) provides that a state must demonstrate to the commissioner that the state has developed a plan to assure that "(B) a free appropriate education will be available for all handicapped children between the ages of three

and eighteen within the State not later than September 1, 1978, and for all handicapped children between the ages of three and twenty-one within the State not later than September 1, 1980, except that, with respect to children aged three to five and eighteen to twenty-one inclusive, the requirements of this clause *shall not be applied in any State if the application of such requirements would be inconsistent with State law or practice, or the order of any court, respecting public education within such age groups in the State.*" (emphasis added.)

quirement of providing individualized education to each handicapped child and of adopting elaborate procedures designed to tailor the state's programs to each particular child's needs. The statute is clear that states will face a loss of federal funding upon a determination by the Commissioner of Education that they have failed to abide by these "contract" terms. 20 U.S.C. § 1413(c). Thus, we can see no reason for not holding a state to these strict procedures once it has accepted federal financial assistance.

### B. Section 504 of the Rehabilitation Act of 1973

In addition to premising relief upon the Handicapped Act, the district court granted plaintiffs injunctive relief based upon § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("§ 504"). This statute provides, in pertinent part that

> [n]o otherwise qualified handicapped individual in the United States, as defined in § 706(7) of this title, shall, solely by reason of his handicap be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance or any program or activity conducted by any executive agency or by the United States Postal Service
> . . .

The district court reasoned that § 504 requires for handicapped children both access to and the provision of the means for enjoyment of the benefits of federal funded programs. The court stated that, "[i]f a child needed a special service to gain equal benefit from his education, the denial of that service would constitute discrimination in violation of § 504."

Defendants challenge the district court's findings on two grounds. First, they urge that the Handicapped Act establishes a comprehensive federal scheme for the education of handicapped children, thus providing an exclusive remedy for the alleged violation of rights in this case. Second, they contend that even if the Handicapped Act and § 504 remedies are not exclusive, relevant precedent limits § 504 to insuring equal opportunity and does not permit affirmative remedies such as arguably mandated by the district court.

The contentions of the defendants are unpersuasive. First, the district court correctly interpreted the statutes by holding that remedies offered by the Handicapped Act and § 504 are not mutually exclusive. Defendants rely primarily on the case of *Brown v. General Services Administration,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976) (holding § 717 of Title VII to be the exclusive federal remedy for employment discrimination claims of federal employees), for the proposition that a precisely drawn statute, especially where later-enacted, preempts general remedies. They argue that allowing plaintiffs to secure relief under § 504 would subvert the carefully crafted internal administrative procedures and the express private right of action offered by the Handicapped Act.[12]

Several cases of the former Fifth Circuit since *Brown* have applied both of these remedies to redress a single legal injury.[13] *See S–1 v. Turlington,* 635 F.2d 342 (5th Cir.1981) (expulsion of handicapped students from school without considering whether their misconduct was related to their handicap violated both § 504 and the Handicapped Act); *Tatro v. State of Texas,* 625 F.2d 557 (5th Cir.1980) (failure to provide catheterization services for handi-

---

**12.** Defendants do not seem to contend that § 504 fails to create a private right of action. The overwhelming weight of appellate court precedence supports such a right. *See Majors v. Housing Authority,* 652 F.2d 454, 455 n. 1 (5th Cir.1981). Rather, they challenge the viability of this right of action to redress the same alleged legal injury *already considered in a* Handicapped Act claim.

**13.** The case law of the former Fifth Circuit Court of Appeals has been adopted by the Eleventh Circuit Court of Appeals as binding precedent unless or until overruled or modified by this court sitting en banc. *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981).

capped children violated both § 504 and Handicapped Act); *Camenisch v. University of Texas,* 616 F.2d 127 (5th Cir.1980), *vacated as moot,* 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981) (deaf graduate student entitled to sign language interpreter services under § 504 without previous resort to administrative remedies). *Accord, Garrity v. Gallen,* 522 F.Supp. 171 (D.D.C.N.H.1982) (both Handicapped Act and § 504 violated by blanket refusal to provide summer services to mentally retarded students); *Pastel v. District of Columbia Board of Education,* 530 F.Supp. 660 (DNH 1981) (Handicapped Act and § 504 create autonomous yet concurrent rights and remedies).

The *Brown* Court was impressed by legislative history indicating exclusivity, as well as by the balance, completeness, and structural integrity of the statute there in issue. We do not find the factors relied upon by the Supreme Court in *Brown* applicable here. First, the Handicapped Act and § 504 may be available to different plaintiffs. The Handicapped Act is limited to children between the ages of 3 and 21, or depending upon local state practice, between the ages of 6 and 17. Section 504 contains no such limitations. Second, the protections of the Handicapped Act apply only to those programs funded under that statute. Nothing prevents a state from satisfying the educational needs of handicapped children through other available federal programs. Section 504 would apply to such programs, whereas the Handicapped Act by its terms would not. *See Kruelle v. New Castle County School District,* 642 F.2d 687 (3d Cir.1981). We are thus persuaded that § 504 grants independent substantive rights regarding procedures for special educational placement which, when vindicated, allow a court to provide remedies under § 504.

The third reason for finding that § 504 supplements the remedies available under the Handicapped Act is based on a careful reading of the regulations promulgated by the Department of Health, Education and Welfare ("HEW") for implementing § 504 and the Handicapped Act. These regulations are significant because of the need to defer to agency expertise in construing a statute when that agency is charged with the statute's administration. *See NLRB v. Bell Aerospace Company,* 416 U.S. 267, 274–75, 94 S.Ct. 1757, 1761–62, 40 L.Ed.2d 134 (1974); Sands, 21 Sutherland's Statutory Construction § 49.05 at 238 (4th ed. 1973). Significantly, the Handicapped Act regulations were first proposed when the § 504 regulations were in their final stages of publication. Rather than create remedies supplanting the § 504 regulations, HEW promulgated an administrative scheme intentionally "consistent" with the § 504 regulations. *See* 41 Federal Register 56967 (1976). Moreover, changes to the § 504 regulations as originally proposed clearly indicate that the statutes harbor concurrent rights and remedies. HEW's proposed regulations provided that, "[a] recipient shall establish and implement . . . the procedural safeguards delineated in . . . the Education of the Handicapped Act . . ." *See* 41 Federal Register 30309 (1976). Appendix A of the final § 504 regulations, however, expressly indicates HEW's perception of an independent substantive content to the two statutes:

> Because the due process procedures of the EHA, incorporated by reference in the proposed § 504 regulations are *inappropriate for some recipients not subject to that act,* the section specifies minimum necessary procedures: notice, a right to inspect records, an impartial hearing, a right to representation by counsel, and a review procedure. The EHA procedures remain *one means* of meeting the regulation's due process requirements, however, and are recommended to recipients as a model.

34 CFR Part 104 Appendix A at Page 361 (1982) (emphasis added). *See* 34 CFR Part 104.36 (1982). *Also see Patsel,* 530 F.Supp. at 64–65.[14]

Defendants finally argue that the § 504 remedy will not support substantial modifi-

---

**14.** Those cases finding exclusivity of recovery under the Handicapped Act and § 1983, *see e.g. Anderson v. Thompson,* 658 F.2d 1205 (7th Cir.1981), present a somewhat different issue because § 1983 stands alone, devoid of the well developed administrative procedures attendant

cations, such as an increase in the length of the school year, because the statute was intended to provide equal opportunity of benefit and does not require affirmative action. They suggest that § 504 merely outlaws the discriminatory denial of services to handicapped children under a federally assisted statute. Defendant's argument is predicated on the Supreme Court's decision in *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979). In *Davis*, a deaf woman was denied individual affirmative assistance necessary to make a college nursing program accessible to her. The Court found that the school was not required to incur undue financial or administrative burdens by making substantial adjustments in its existing programs to admit the woman. The Court reached this result, however, by construing the phrase "otherwise qualified handicapped person" in § 504 to mean one who is able to meet all of a program's requirements "in spite of," rather than except for, his or her handicap. 442 U.S. at 406, 99 S.Ct. at 2367. The Supreme Court concluded that Davis was not otherwise qualified because she could never benefit from the school's program. Davis' handicap prevented her from safely performing in both her training program and her proposed profession.

■ Given the basis for the Supreme Court's holding in Davis, we do not find that it bars § 504 relief for the plaintiffs.

§ 504 regulations. *See Tatro v. State of Texas*, 516 F.Supp. 968 (N.D.Tex.1981). To the extent such cases are inconsistent with our holding, we reject their analysis.

15. The United States, invited to file a brief as amicus curiae has blown hot, cold and hot as to the coverage under Section 504. In a brief filed in the district court, the Department stated that "under existing regulations implementing EHA–B (34 CFR 300.300) *and section 504* ... state rule or policy that imposes time limitations on the provision of services to handicapped children precludes an individual determination of each handicapped child's unique needs for services." Notice published 45 Fed. Reg. 85083, Dec. 24, 1980. (emphasis added).

In a brief amicus filed since oral argument, the United States says:

In *Camenisch* this Court interpreted the scope of the Supreme Court's decision in *Davis* in a highly limited fashion. There we stated, "The Supreme Court's decision in *Southeastern Community College* says only that § 504 does not require a school to provide services to a handicapped individual for a program for which the individual's handicap precludes him from ever realizing the principal benefit of the training." *Camenisch*, 616 F.2d at 133. *Camenisch's* limited reading of *Davis* was relied upon by the former Fifth Circuit in *Tatro* as well. 625 F.2d at 564. We have no doubt that the plaintiffs would benefit from the extended programming under consideration. Moreover, we do not believe that even year round schooling, the most comprehensive substantive relief available to the plaintiffs, would constitute a change in the *scope* of services as envisioned by *Davis*. The Supreme Court in *Davis* recognized that, "the line between a lawful refusal to extend affirmative action and illegal discrimination against handicapped persons always will [not] be clear ...." 442 U.S. at 412, 99 S.Ct. at 2370. Here we conclude that due to § 504's broad recognition of the impermissibility of the "denial" of "benefits," the district court did not err in finding that defendants' actions fall without the bounds of the law.[15]

VII. Issues on Cross Appeal

Plaintiffs assert two bases for reversal on cross appeal. First, they claim that the

Careful review of the Section 504 issue has led us to conclude that our position in the district court—that the 180 day policy violated Section 504—was erroneous.

Most recently, counsel for appellees has provided us with a copy of a recent Memorandum, from the assistant secretary for civil rights of the Department of Education, dated May 24, 1983, which concludes with the statement:

We have concluded that a recipient which categorically excludes consideration in its evaluation and placement procedures of any nonmedical service, including extended school year or extended school day services, violates Section 504 and its accompanying regulation at 34 C.F.R. § 104.33(a).

This last word from the Department, of course, supports the views we have expressed above.

district court, in declining to issue individual injunctions explicitly requiring more than nine months schooling for certain plaintiffs, applied the wrong legal standard under the Handicapped Act. Plaintiffs argue that the district court applied an "irreparable injury" standard rather than the "preponderance of the evidence" standard for *de novo* review specified in § 1415(e)(2).

Plaintiffs are correct in emphasizing the importance of the Handicapped Act's preponderance of the evidence standard. The court in *Campbell v. Talladega County Board of Education,* 518 F.Supp. 47, 53 n. 9 (W.D.Ala.1981), explained that:

> The preponderance of the evidence standard codified at 20 U.S.C. § 1415(e)(2) reflects a decision to accord a greater rule in the enforcement scheme to the federal courts. The original House version which provided that the determination of the state agency would be "conclusive in any court of the United States supported by substantial evidence" was rejected by the conference committee and the present language was substituted. Senate Report Number 455, 94th Congress, 1st Session 47–50 (1975), *reprinted in* [1975], U.S. Code Cong. & Ad.News 1480, 1500–02.

■ Despite this importance, plaintiffs' argument is unavailing on two accounts. First, the "irreparable injury" standard for injunctions is not a standard of persuasion, but a substantive requirement dictating the content of the proof that will be found probative. There would be nothing inconsistent in finding "irreparable injury by a preponderance of the evidence." [16]

■ Second, the court's requirements that local school boards carry the burden of determining need in the first instance and

that they must give full consideration to the merits of educational placement for longer than 180 days comport with the wide discretion the statute affords a district judge in granting relief. The Handicapped Act provides that the judge, "shall grant such relief as is appropriate." 20 U.S.C. § 1415(e)(2). The court has no obligation under this section to rule on the merits of an individual IEP. The district court's refusal to grant the individual injunctions, while at the same time prohibiting exercise of the state and local defendants' general policy on duration, is the type of creative remedy permitted by the statute.

■ Plaintiffs would also have us find the district court's injunction, prohibiting the defendants' across the board policy, insufficiently specific under Federal Rule of Civil Procedure 65(d).[17] Plaintiffs complain that the injunction offers no criteria by which to measure the compliance of the defendants. In light of the elaborate procedural requirements of the Handicapped Act, and the discretion traditionally accorded the grant of equitable remedies, we do not find the injunction inadequate. Nothing prevents the plaintiffs from seeking further relief from the district court if the defendants fail to comply in good faith with the requirements of the injunction and the applicable federal standards.

The judgment of the district court is therefore AFFIRMED.

JAMES C. HILL, Circuit Judge, dissenting.

I respectfully dissent from the judgment in this case affirming the district court not because the judgment may not result in a proper and appropriate educational oppor-

---

16. The District Court's otherwise well thought out and documented findings, while not a model of clarity on this particular issue, seems to conform to the notion discussed in the text. The court stated, "Overall, the evidence presented was not conclusive enough to justify the issuance of the mandatory injunction [for the individual plaintiffs]."

17. Federal Rule of Civil Procedure 65(d) provides: "Every order granting an injunction and every restraining order shall set forth the rea-

sons for its issuance; shall be specific in terms; shall describe in detail, and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise."

tunity for the appellee and those in the class, but because, in my view, neither the district court nor this court is constitutionally entitled to, or under a duty to, decide the issue.

I have carefully studied the provisions of the Education for All Handicapped Children Act, 20 U.S.C. § 1401 *et seq.* While it contains a number of provisions, nowhere does it amount to legislation by the Congress on the issue seen as confronting the nation. It describes the problem which might cryptically be stated as the unsatisfactory educational opportunities found to be available to handicapped children. In a number of provisions, it announces that these handicapped children should have an "appropriate" education. It appears to me that the legislative branch, acknowledging the existence of a serious problem, has acknowledged that the solution to it should be the "appropriate" solution. This is not legislation; it is not even news! It goes without saying that when the Congress is confronted with a problem facing the country and feels that governmental intervention is necessary, the law to be passed should be an appropriate law.

In the Handicapped Act, a structure is created looking towards the determination, by some institution (not the Congress), of what an appropriate solution to the problem might be. Thus, the states which care to avail themselves of the financial resources provided by the law are required to establish plans that assure all handicapped children a "free appropriate public education." 20 U.S.C. § 1412. These plans are to be submitted to the then Commissioner of Education, now the Secretary of Education, for approval before any funds are to be made available to the state. 20 U.S.C. § 1413. If the Commissioner of Education should approve a plan providing for educational opportunities for the handicapped less than what might be found appropriate, no provision is made for an appeal. If the Commissioner refuses to approve a plan contended by the state to provide for appropriate educational opportunities, the state can appeal to the circuit court of appeals. 20 U.S.C. § 1416(b)(1).

Whether or not any of these procedures created by the congressional delegation to the agencies and the states results in an appropriate education for a handicapped child cannot be determined by reference to any of the provisions of the law passed by the Congress. Indeed, it cannot be determined by reference to any of the regulations established by the Commissioner in exercising the Commissioner's delegated authority. When all is said and done, if a citizen be dissatisfied with the education to be offered to a handicapped child, the entire matter is to be decided, de novo, by a United States district judge. 20 U.S.C. § 1415(e). What the district judge is required to do, if the Congress may delegate this power and responsibility to the district judge, is to determine, on a case-by-case basis, what is the "appropriate" answer to the problem seen by the Congress to confront the country.

As I view the Handicapped Act and the regulations, it appears that no branch of the politically responsive branches of government has yet been willing to provide the appropriate answer to the compelling problem. Although there are many provisions in the law, the Congress and the Department of Education take the position that the ultimate making of the law as to any particular state shall be that which a district judge deems to be an appropriate law. Nevertheless, the legislative branch cannot delegate or confer legislative power on the courts or impose legislative duties upon them because such duties are not judicial in nature. *See, e.g., National Mutual Insurance Co. v. Tidewater Transfer Co., Inc.,* 337 U.S. 582, 590–91, 69 S.Ct. 1173, 1177, 93 L.Ed. 1556 (1949); *Kilbourn v. Thompson,* 103 U.S. 168, 190–91, 26 L.Ed. 377 (1880).

The separation of powers created by our finely-tuned constitutional system of government is offended when the legislative branch undertakes to abdicate its sometimes most difficult tasks to the judicial branch. If that willingness on the part of the legislative branch to abdicate is met by a willingness on the part of the judicial

branch to accept inappropriate power and responsibility, the system of government in this country is, to that extent, eroded.

I am aware that in *Board of Education v. Rowley,* 458 U.S. 173, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), the Court determined what is generally meant by the Handicapped Act's requirement of a "free appropriate public education." My review of the case and the briefs, however, indicates that the constitutionality of the Act's delegation of legislative authority to district courts was not raised by the parties or considered by the Court. Here also, no party litigant attacks the constitutionality or advisability of this attempt on the part of the Congress to pass over to the judiciary the difficult task of creating an appropriate law in this area. If it were attacked by the appellee and the class, it would jeopardize the funds to be used for the education of those so situated. If it were attacked by the local board of education or the State, the funds to administer the program would be in jeopardy. The Department of Education has represented to this court that it is quite comfortable with the law being made by the judiciary. Thus, all of the parties are satisfied that the legislative function in this difficult area be handled by the one branch of government not responsive to the electorate—the judiciary.

Unless those working in the judicial branch shall be, sua sponte, sensitive to this breach of the separation of powers, legislative activity will be exercised by the branch least appropriate to its exercise, not by virtue of any usurpation or "power grab" on the part of the courts, but by virtue of a willing abdication of this "hot potato" by the Congress and the executive. It has long been recognized that a federal court must on its own motion ascertain its jurisdiction and I apprehend that the same rule applies to the court's ascertainment of its power to act under Article III, Section 2 of the Constitution. That Article III judicial power extends to all cases arising under the laws of the United States but does not extend to the resolution of debates as to what the law of the United States ought to be—even though the legislative branch, charged with that responsibility and given that power to make the law, might invite the court so to act.

Inasmuch as I feel this delegation to be unconstitutional, I should, on that basis, vacate the judgment of the district court and remand the case to the district court for dismissal, the question presented being within the domain of the Congress as established by Article I of the Constitution and beyond the jurisdiction established by the Constitution for Article III courts.