915 F.2d 651
 63 Ed. Law Rep. 40
 Mr. DOE and Mrs. Doe, as parents and next friend of John
Doe, a Handicapped minor, Plaintiffs-Appellants,
v.
The ALABAMA STATE DEPARTMENT OF EDUCATION; Wayne Teague,
its Superintendent; Ann Ramsey, its Program for
Exceptional Children Coordinator; Anita
Hardin; Gerald S. Leischuck, Defendants,
the Auburn City Board of Education; its Superintendent,
Edward R. Richardson; its Assistant Superintendent and
Special Education Coordinator Gerald W. Johnson; its
Chairman, James K. Haygood, Jr.; its Vice-Chairman, Theoler
Harris; its members Ila Miller; Carolyn G. Mathews; and
Larry D. Ridgeway; and the Principal of Auburn High School,
Robert W. Dotson, Defendants-Appellees.
 No. 89-7527.
 United States Court of Appeals,
Eleventh Circuit.
 Oct. 24, 1990.
 
 Jonathan A. Zimring, Atlanta, Ga., for plaintiffs-appellants.
 Robert T. Meadows, III, Walker, Hill, Adams, Umbach & Meadows, Opelika, Ala., for Auburn City Bd. of Educ., Richardson, Miller, Johnson, et al.
 Appeal from the United States District Court for the Middle District of Alabama.
 Before HATCHETT and ANDERSON, Circuit Judges, and DYER, Senior Circuit Judge.
 ANDERSON, Circuit Judge:
 
 
 1
 This appeal involves a dispute over the appropriate educational placement for John Doe under the Education of the Handicapped Act (EHA), 20 U.S.C. Secs. 1401-1461 (1990) and section 504 of the Rehabilitation Act of 1973, 9 U.S.C. Sec. 794 (1982 & Supp.1990). In the district court, the Does challenged a state hearing officer's determination that the defendants offered John a free appropriate public education and that placement in a private residential school was not necessary. The district court agreed with the hearing officer that the defendants offered John an educational program which met the requirements of the EHA. The court also found that the school did not violate section 504 by intentionally discriminating against John in its provision of services to him. For the following reasons, we affirm the judgment of the district court.
 
 I. OVERVIEW OF THE EHA
 
 2
 The EHA was enacted to encourage and assist the provision of a free and appropriate education by the states to all handicapped children.[1] The EHA provides federal aid to state and local agencies that comply with its provisions. In order to qualify for federal assistance the agency must "[have] in effect a policy that assures all handicapped children the right to a free appropriate public education." 20 U.S.C. Sec. 1412(1). The EHA defines "free appropriate public education" as:
 
 
 3
 special education and related services which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title.
 
 
 4
 20 U.S.C. Sec. 1401(a)(18). The Supreme Court has held that in order to satisfy its duty to provide a free appropriate public education, a state must provide "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." Hendrick Hudson Central School District Board of Education v. Rowley, 458 U.S. 176, 203, 102 S.Ct. 3034, 3049, 73 L.Ed.2d 690 (1982).
 
 
 5
 The "personalized instruction" required by the EHA is carried out in accordance with an "individualized educational program" (IEP), which must be developed for each handicapped child. The IEP is developed as a written statement for each child in a meeting between the teacher, parents or guardian, and local educational agency representatives. The statement must include a discussion of the child's present level of performance; annual goals and short-term instructional objectives; the specific educational services to be provided to the child; the extent to which the handicapped child is able to participate in regular educational programs; the projected date of initiation and duration of the services; and the means of determining whether the instructional objectives are being met. 20 U.S.C. Sec. 1401(a)(19).
 
 
 6
 As this court has noted, the IEP is more than a mere exercise in public relations. It forms the basis for the handicapped child's entitlement to an individualized and appropriate education. Georgia Association of Retarded Citizens v. McDaniel, 716 F.2d 1565, 1571 (11th Cir.1983), vacated on other grounds, 468 U.S. 1213, 104 S.Ct. 3581, 82 L.Ed.2d 880 (1984), adopted and modified on other grounds, 740 F.2d 902 (1984). As such, its development and formalization are the focus of a host of procedural requirements.[2] Such requirements regulate, among other things, the timing and methods of evaluating and classifying a child's handicap, the notification that must be given parents or guardians prior to school action regarding the child, the personnel required to be consulted in creating an IEP, and the procedures for reevaluating a child and revising an IEP.
 
 
 7
 The EHA also provides important procedural rights for the parent and child in the event a child's education deviates from a mutually arrived upon IEP. Georgia Association of Retarded Citizens, 716 F.2d at 1571. See also Smith v. Robinson, 468 U.S. 992, 1010-11, 104 S.Ct. 3457, 3467-68, 82 L.Ed.2d 746 (1984) (noting that the EHA not only establishes an enforceable substantive right to a free appropriate public education, but it also establishes an elaborate procedural mechanism to protect the rights of handicapped children). The EHA grants handicapped children or their parents or guardians "an opportunity to present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. Sec. 1415(b)(1)(E). Thus, parents are entitled under the EHA to prior written notice whenever an educational agency proposes or refuses to initiate a change in the evaluation or educational placement of their child or the provision of a free appropriate public education to the handicapped child. 20 U.S.C. Sec. 1415(b)(1)(C). If dissatisfied with the educational program offered by the school, parents or guardians are entitled to an impartial due process hearing, 20 U.S.C. Sec. 1415(b)(2); 20 U.S.C. Sec. 1415(c), complete with all the rights of a full trial, 20 U.S.C. Sec. 1415(d). Finally, parents have a right to appeal a decision of the state educational agency to a United States district court, which shall hear such additional evidence necessary to engage in a de novo resolution of the complaint. 20 U.S.C. Sec. 1415(e)(2), (4).
 
 
 8
 The Supreme Court, in Board of Education v. Rowley, delineated the appropriate standard of review for a court faced with a challenge to state educational decisions:
 
 
 9
 [A] court's inquiry in suits brought under Sec. 1415(e)(2) is two-fold. First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these two requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.
 
 
 10
 Rowley, 458 U.S. at 206-07, 102 S.Ct. at 3051 (footnotes omitted). In this case, the plaintiffs challenge the school board's decisions regarding their son's educational program under both prongs of the Rowley standard.
 
 II. FACTS
 
 11
 John Doe is currently nineteen years old and suffers from a major affective disorder, specifically manic-depressive illness. This illness has caused John substantial academic difficulty, as it creates episodes of depression and unmanageable hyperactivity, affects John's ability to concentrate, and causes him considerable stress when he is confronted by the normal educational environment.
 
 
 12
 At the age of 14, during the summer between his seventh and eighth grade years at school, John experienced severe emotional disturbances and was hospitalized for approximately three months at the Child and Adolescent Psychiatric Unit at Vanderbilt University Hospital. There, he was diagnosed as having a schizophrenic disorder, paranoid type. While he was hospitalized, John's parents moved from Johnson City, Tennessee, to Auburn, Alabama. Upon John's release from the hospital, Mrs. Doe contacted the Auburn City Schools' Special Education Coordinator seeking educational services for John. John arrived in Auburn in early October 1985.
 
 
 13
 In late October or early November of 1985, Auburn City Schools classified John as an emotionally conflicted (E/C) student. Such classification entitled John to services as a handicapped student under the EHA. At first, defendants provided John with a home tutorial program of three hours per week. Later, in January 1986, pursuant to an IEP developed by John's tutor, John began attending special education and regular academic classes at Auburn Junior High School. John's placement at the Junior High School was not entirely successful. John began to experience emotional disturbances, and he was often tardy for class and failed to turn in work assignments. Approximately one month before the end of the semester, John was placed on in-school suspension; he was later suspended for the last five days of the 1985-86 school year.
 
 
 14
 During the summer of 1986, John was hospitalized for severe depression. His diagnosis was revised from schizophrenia to manic-depressive illness. At this time, John's doctor changed his drug therapy from anti-psychotic drugs to lithium. The lithium treatment has proved somewhat successful in stabilizing John's disorder. No educational services were offered to John during this summer.
 
 
 15
 In August of 1986, Mrs. Doe contacted the Special Education Coordinator for Auburn City Schools, seeking educational services for John for the fall. A placement test was administered to John, and it was decided that John would attend Auburn High School. John attended only one day of classes at Auburn High School in the fall of 1986; after that, he refused to return to school.
 
 
 16
 The Does unilaterally decided to enroll John in Sexton Woods Psychoeducation Center, a public school in DeKalb County, Georgia. John attended Sexton Woods for two weeks before he refused to return to school there.
 
 
 17
 In January of 1987, John returned to Auburn, and the Does again sought educational services from the Auburn City Schools. The school provided tutorial services for John at the school administrative building from February through May. A formal IEP was approved in May of that year. The IEP called for John to attend classes five days a week for three hours a day, to receive counseling services to bolster his self-esteem, to train on a computer, and to attend summer school for one credit of either English or math. Pursuant to the IEP, John attended school five days a week, received some private counseling services, received some computer training, and began a summer school tutorial in math. John earned one unit of credit for the summer school math class, and he maintained a grade average of 92.
 
 
 18
 On September 1, 1987, the Does met with school representatives to formulate an IEP for the 1987-88 academic year. The school presented the Does with a proposed schedule, under which John would attend Auburn High School in the afternoons for four hours per day, five days per week. John would spend one hour per day (after regular school hours) with an academic area specialist receiving instruction in English, math, social studies, and science. The balance of John's time at school would be spent attending counseling sessions, working with a learning disabilities teacher, and working on a community service project. John was also to spend part of his mornings working on his service project. This proposed schedule was to be in effect for six weeks. The schedule called for several revisions during the year so that John would gradually be required to spend more time at school, until by the end of year John would spend the full day at school.
 
 
 19
 The Does rejected the proposed IEP, and in October they obtained an independent evaluation of John, performed by Dr. Walter Jacobs, a clinical psychologist. Dr. Jacobs recommended residential school placement for John. He noted that John's needs would best be served by a combination of tutorial programming and small classes of young people with similar problems. In November of 1987, the Does unilaterally enrolled John at Brandon Hall, a private residential school in Atlanta that accepts children who have difficulty in a normal school environment. John did relatively well at Brandon Hall through most of the year but was expelled in April 1988, for sharing his medication with a fellow student. Brandon Hall rejected the Does' efforts to have John readmitted.
 
 
 20
 John subsequently returned to Auburn, and in May 1988 the school held an IEP meeting, which the Does attended and at which the school presented another proposed IEP. No IEP was agreed upon, and John received no services at that time. The Does met again with school personnel in August 1988 to draw up an IEP, and the possibility of creating a program on the campus of a local university was discussed. However, an IEP was not agreed upon, and John did not begin school in the fall.
 
 
 21
 At another IEP meeting in December 1988, Mrs. Doe proposed an IEP that was accepted by the Auburn City Schools. The Auburn Board retroactively reimbursed the Does for the private tutor they had hired for John in August. Under the IEP adopted in December, John was to receive tutoring in English, algebra, biology, tenth grade history, and computer literacy, and was to earn credit for adaptive physical education. The school was to provide someone to coordinate John's program of education. The IEP also identified goals for John's social, emotional, and behavioral progress, and it provided for a vocational rehabilitation evaluation.
 
 
 22
 As of the time of the trial in April 1989, John was receiving tutoring at his home in composition and writing (begun in October), history (begun in March 1989), math (begun immediately prior to the trial in April 1989), and computer literacy. As of April 1989, instruction in science had not yet begun for John. A science tutor had been proposed by the school but was rejected by the Does because the proposed tutor could not schedule classes between 8:00 am and 4:00 pm. The school was not providing 24-hour psychiatric supervision of John, and the Does were providing and paying for John's psychiatric counseling.
 
 III. PROCEDURAL BACKGROUND
 
 23
 In November 1987, the Does requested a due process hearing to challenge the IEP proposed by the school in September 1987, which provided that John would attend the high school, where he would receive academic and special education tutoring. The Does objected to the school's refusal to provide a residential placement for John. A due process hearing was held in December of 1987, at which time the hearing officer determined that the IEP proposed in September was reasonably calculated to provide John with a free appropriate education.
 
 
 24
 Following the final decision of the hearing officer, the Does filed suit in federal district court. The Does sought an order requiring the defendants to provide John with a free appropriate public education and requiring reimbursement for the expenses incurred by the Does in providing for John's education and related services for the past three years.
 
 
 25
 After a bench trial, the district court upheld the hearing officer's determination.[3] The district court found that the defendants did not intentionally discriminate against John. The IEPs offered to John by the defendants for the 1987-88 and 1988-89 school years (which were the only IEPs challenged as being substantively inadequate) were held to be appropriate because they were designed to provide John with substantial educational benefits. The court further found that a residential placement removing John from his home would be inappropriate. The court therefore refused to order reimbursement for the expenses the Does incurred in placing John at Brandon Hall for the 1987-88 school year. Additionally, the court found that any possible procedural violations committed by the school did not disadvantage John in his receipt of a free appropriate public education.
 
 IV. ISSUES
 
 26
 The Does' primary contention in the district court focused on the school's alleged violation of John's substantive right to a free appropriate public education, and in particular their allegation that the only appropriate education for John was in a residential setting. We discuss the allegations of substantive violations of the EHA in Part VI below. The Does have also alleged that the school violated certain procedural requirements of the EHA. In this regard, the Does argue that the district court erred in finding that the violations were harmless. They also argue that the district court erred in rejecting their per se violation argument. We address these contentions in Part V. Finally, the Does argue that the district court erred in holding that section 504 of the Rehabilitation Act of 1973 requires a showing of an intent to discriminate. We address this issue in Part VII.
 
 
 27
 V. VIOLATIONS OF THE PROCEDURAL REQUIREMENTS OF THE EHA
 
 
 28
 The twin concerns of the EHA are (1) its procedural safeguards, i.e. the adoption of extensive due process procedures that are designed to insure a particularized education that meets individual needs; and (2) its substantive educational goals, i.e. the development of an IEP for each child that incorporates his or her special needs, so that the child may benefit from the program offered. Georgia Association of Retarded Citizens, 716 F.2d at 1569. The Supreme Court acknowledged these twin concerns in Board of Education v. Rowley, 458 U.S. at 206-07, 102 S.Ct. at 3051, where the Court established the standard to be used when determining whether a handicapped child's educational program provides the child with a free appropriate public education: First, the reviewing court must determine whether the state has complied with the procedures set forth in the EHA, including the creation of an IEP that conforms to the requirements of Sec. 1401(a)(19).[4] Second, the court must determine whether the IEP developed through the EHA's procedures is reasonably calculated to enable the child to receive educational benefits.
 
 
 29
 The Does contend that the defendant school board did not comply with the procedures set forth in the EHA for the creation of an appropriate IEP. They argue that, given the Supreme Court's recognition of the importance Congress placed on compliance with the EHA's procedures, see Rowley, 458 U.S. at 205-06, 102 S.Ct. at 3050, the procedural violations committed by the school board in this case are sufficient in and of themselves to constitute a violation of the EHA warranting relief.
 
 
 30
 The Does point to several procedural violations alleged to have been committed by the defendants:[5]
 
 
 31
 (1) the Does contend that John was suspended from school in the spring of 1986 without the benefit of an IEP meeting;
 
 
 32
 (2) although the Does do not contend that they failed to receive actual notice of IEP meetings or that they were not allowed to attend such meetings, they do contend that they were not provided with the very detailed notice required by the regulations and thus were not afforded the full participation contemplated by the EHA;(3) the Does contend that services were provided to John during the spring of 1987 without the benefit of an IEP, which was not agreed upon until May 1987;
 
 
 33
 (4) the Does contend that the school's initial classification of John in October 1985 as an emotionally conflicted (E/C) student was done without the benefit of an appropriate evaluation, and also that the January 1986 IEP was invalid because it was not based on appropriate evaluations;
 
 
 34
 (5) the Does contend that the school violated the procedural requirement of considering all potential placements when it refused to consider the possibility of a residential placement for John.
 
 
 35
 We will deal with each alleged procedural violation in turn. First, however, we must address the defendants' contention that the Does did not exhaust their state administrative remedies before bringing these procedural claims in federal district court.
 
 A. Exhaustion of State Remedies
 
 36
 The EHA provides that whenever a complaint is received, the parent or guardian "shall have an opportunity for an impartial due process hearing which shall be conducted by the State educational agency or by the local educational agency." 20 U.S.C. Sec. 1415(b)(2). The statute also provides for civil action by an aggrieved party:
 
 
 37
 Any party aggrieved by the findings and decision made under subsection (b) of this section who does not have the right to an appeal under subsection (c) of this section, and any party aggrieved by the findings and decision under subsection (c) of this section, shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy. In any action brought under this paragraph the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.
 
 
 38
 20 U.S.C. Sec. 1415(e)(2). Thus, the language of Sec. 1415 of the EHA indicates that the administrative procedures outlined in the statute are to be pursued prior to recourse to the district courts. This court has held that absent considerations of futility or inadequacy of administrative remedies, a plaintiff is required to utilize the administrative scheme established by the EHA before resorting to the courts to challenge actions of the local school authorities. Association For Retarded Citizens Of Alabama (ARC) v. Teague, 830 F.2d 158, 160-61 (11th Cir.1987).
 
 
 39
 The defendants in this case contend that the issues involving the school's violation of the EHA's procedural requirements were not raised at the due process hearing; thus, they argue, the Does have failed to exhaust their administrative remedies in regard to these issues. At the due process hearing, the Does presented four issues for consideration: identification of John's handicap, evaluation of the handicap and its impact on John's educational program, appropriate placement and services for John, and the propriety of the school's suspension of John in the spring of 1986. The hearing officer noted that the emphasis at the hearing would be on placement and services for John; the other issues were, however, properly before the hearing officer. Testimony concerning the process the school used in identifying John's handicap, in evaluating John, and in determining his appropriate educational program was presented at the hearing. The closing remarks by the attorneys for both parties focused primarily on whether residential placement was required for John.
 
 
 40
 During the hearing, the plaintiffs explicitly abandoned their claim involving John's suspension from the Junior High School in May 1986. The hearing officer's report, therefore, did not discuss that issue. The report addressed explicitly the issues of whether John had been properly identified as an E/C student and whether residential placement was appropriate or necessary for John. It also contained findings of fact regarding the history of the school's dealings with John, including the process used by the school in formulating the various IEPs involved in this case. The report did not comment upon whether there had been procedural violations of the EHA or whether such violations, if any, resulted in harm to John's educational progress.
 
 
 41
 We conclude that the plaintiffs adequately placed before the state hearing officer the procedural violation issues.[6] Evidence regarding these alleged procedural violations of the EHA was presented at the due process hearing. Our review of the administrative record persuades us that the procedural violations now asserted were fairly presented before the hearing officer. Therefore, we conclude that the Does have adequately exhausted their administrative remedies regarding these claims, and the district court did not abuse its discretion in considering them.
 
 B. Suspension/Expulsion
 
 42
 The Does complain that John was suspended and later expelled during the spring of 1986 without benefit of the procedural protections afforded by the EHA.[7] The Does explicitly waived this claim at the state due process hearing, and the defendants objected to the claim when the Does instituted the present action in federal district court. Although the district court did not explicitly address whether the suspension/expulsion claim was waived by the Does, it did not address the merits of the claim in its order. We conclude that the Does have waived this claim; they therefore may not assert it on appeal.
 
 C. Notification and Parental Participation
 
 43
 The Does contend that the school failed to provide them with complete and correct notification of IEP meetings regarding their son.[8] Under the Federal Regulations, prior written notice to the parent or guardian of a handicapped child is required whenever the school proposes to initiate or change (or refuses to initiate or change) the identification, evaluation, or educational placement of the child. 34 C.F.R. Sec. 300.504(a). The notification must include a full explanation of the procedural safeguards available to the parents, a description of the action proposed or refused, an explanation of why the action was proposed or refused, a description of any options the school considered and why those options were rejected, a description of the evaluation procedures used to form the basis of the proposal or refusal, and a description of other relevant factors. 34 C.F.R. Sec. 300.505(a). The Does contend that the school's notice of IEP meetings was never as complete as is required by the Federal Regulations. The Does also contend that the school's failure to abide by the EHA's requirements regarding notification to parents precluded them from effective participation in planning their son's educational program.
 
 
 44
 The district court held that, while there may have been some deficiencies with regard to notice, the Does had actual notice of all meetings; the court also found that the Does fully participated in all decisions regarding their son. The court specifically noted that the school remained in close contact with the Does and was responsive to their requests (e.g., the request in the 1985-86 school year that John be mainstreamed as much as possible into the regular classes, the request that a computer be made available to John, and the request that John receive support tutoring throughout the time period involved). The court found that delay in formalizing an IEP for John in the spring of 1987 was a result of the Does' conscientious participation in the IEP process, and the IEP settled upon for the 1988-89 school year was largely of the Does' creation. Thus, the district court concluded that any deficiency in notification had no impact upon the Does' participation or the decisions made or the services provided.
 
 
 45
 The Does challenge the district court's decision in two respects. First, they suggest that the district court erroneously found that the alleged procedural deficiencies had no impact. Notwithstanding the conclusory fashion in which the Does' challenge to the district court's findings is presented, we have carefully reviewed the record regarding the extent of the Does' participation in the IEP process. We conclude that the district court's finding is amply supported in the record; at every stage, the participation of the Does has been full and effective.[9]
 
 
 46
 The Does also challenge the district court's rejection of their per se violation argument. The Does contended in the district court and on appeal that the school's violation of the notice requirement was a per se violation of the EHA, which by itself constituted a denial of a free appropriate public education and thus provided a basis for reimbursing the Does for their expenses incurred when they placed John in a private educational institution. In support of their per se violation argument, the Does rely upon Hall v. Vance City Board of Education, 774 F.2d 629, 635 (4th Cir.1985) ("failures to meet the Act's procedural requirements are adequate grounds by themselves for holding that the school board failed to provide [the child] with a FAPE [free appropriate public education]").
 
 
 47
 It is beyond dispute that full parental involvement in the handicapped child's education is the purpose of many of the EHA's procedural requirements. The Supreme Court has noted:
 
 
 48
 When the elaborate and highly specific procedural safeguards embodied in Sec. 1415 [setting out the requirements of written notice to parents or guardian, due process hearing, and administrative and judicial review] are contrasted with the general and somewhat imprecise substantive admonitions contained in the Act, we think that the importance Congress attached to these procedural safeguards cannot be gainsaid. It seems to us no exaggeration to say the Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process as it did upon the measurement of the resulting IEP against a substantive standard. We think that the congressional emphasis upon full participation of concerned parties throughout the development of the IEP, as well as the requirements that state and local plans be submitted to the Secretary for approval, demonstrates the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP.
 
 
 49
 Rowley, 458 U.S. at 205-06, 102 S.Ct. at 3050. In this passage, the Court recognized both the importance of the EHA's procedural requirements and the purpose of those requirements: "full participation of concerned parties throughout the development of the IEP."
 
 
 50
 Because the notice deficiencies in this case had no impact on the Does' full and effective participation in the IEP process and because the purpose of the procedural requirements was fully realized in this case, we agree with the district court that there has been no violation in this case which warrants relief.[10]
 
 
 51
 Our holding is supported by the case law in other circuits. The Fourth Circuit's approach to per se violations of the EHA, as articulated in Tice v. Botetourt County School Board, 908 F.2d 1200 (4th Cir.1990), is similar to the approach we take today. In Tice, the School Board violated evaluation time limits established by state regulations. This violation resulted in a delay in developing an IEP for the child; after a delay of several months, the school developed a proper IEP. The court granted relief (i.e., reimbursement of the parents' expenses for alternative placement) for the period of time that the procedural violation caused delay in establishing an appropriate IEP. However, the court denied relief for similar expenses incurred after the appropriate IEP was in place. The court held that "these procedural violations had no impact on whether [the child's] IEP adequately assured him of a FAPE [free appropriate public education] after January 6, 1987 [when the appropriate IEP took effect]."
 
 
 52
 In Tice, the court quoted language from its earlier opinion in Hall v. Vance County Board of Education, 774 F.2d 629, 635 (4th Cir.1985), which purported to adopt a per se analysis of procedural violations. However, the Fourth Circuit in Tice did not adhere to a per se analysis. Rather, the court looked to the harm flowing from the violation in order to determine whether relief was warranted. In fact, in Hall itself, the court found that the procedural violation at issue--failure to notify the child's parents of their rights under the EHA--denied the parents the opportunity to participate effectively in the IEP process. The court in Hall additionally found that the IEP offered by the school did not adequately confer educational benefits on the child. Thus, the procedural violation that was held to warrant relief in fact resulted in demonstrable harm.[11]
 
 
 53
 The Eighth Circuit has also adopted an analysis of procedural violations that considers the harm flowing from the violation in assessing whether relief is appropriate. In Evans v. District No. 17 of Douglas County, Neb., 841 F.2d 824 (8th Cir.1988), the court noted that "in a proper case, monetary relief can be awarded for procedural violations." Id. at 828. However, the court went on to hold that the procedural violation at issue in that case--the school's failure to reevaluate the handicapped child at the appropriate time--did not harm the child's educational progress in any way. Thus, the court concluded that relief was not appropriate.[12]
 
 
 54
 For the foregoing reasons we conclude that the district court correctly denied relief on the basis of the defendants' violation of the EHA's notice requirement. The district court properly found that John Does' parents participated fully and effectively in the development of John's IEP. We appreciate the Does' deep concern for the welfare of their son and commend their struggle to obtain the best possible education for him. However, because full and effective parental participation in the IEP process is the actual purpose of the EHA's parental notification requirement, the school's violation of the letter of the requirement does not require relief where, as here, the parents fully participated in the IEP process and there was no harm flowing from the procedural violation.
 
 
 55
 D. Delivery of Services Without Benefit of a Written IEP
 
 
 56
 The Does contend that the school delivered services to John in the spring of 1987 without the benefit of any written IEP. The Federal Regulations require that an IEP be in effect before special education and related services are provided to a child. Additionally, the IEP must be implemented as soon as possible following the required meetings. 34 C.F.R. Sec. 300.342(b).
 
 
 57
 The district court found that John did in fact receive services in the spring of 1987 without the benefit of an IEP. The court noted, however, that during this time the school was in frequent contact with the Does, attempting to work out an IEP that would be acceptable to them. The district court found that the delay in formalizing an IEP for John was the result of the Does' active participation in the IEP process. Our review of the record persuades us that the district court was not clearly erroneous in concluding that the delay in formulating the IEP was caused by the Does and does not constitute a violation of the procedural requirements of the EHA. Cf. Daniel R.R., 874 F.2d at 1042-43 (where school's failure to perform reevaluation of child was result of parents' refusal to consent, parents would not be heard to complain that school violated required procedure).
 
 E. Evaluations
 
 58
 The Does contend that when John entered the system, the school classified him as an E/C student without first performing proper evaluations of the child. The Does further contend that the January 1986 IEP was invalid because it was not based on appropriate evaluations. The Federal Regulations require that "[b]efore any action is taken with respect to the initial placement of a handicapped child in a special education program, a full and individual evaluation of the child's educational needs must be conducted in accordance with the requirements of Sec. 300.532." 34 C.F.R. Sec. 300.531. The Regulations also set out detailed requirements regarding the proper administration and use of the tests and other materials used to evaluate a child. Most relevant to this case are those requirements that the test be tailored to assess specific areas of educational needs and not merely designed to provide a single general intelligence quotient, that no single procedure be used as the sole criterion for determining a child's educational program; that the evaluation be made by a multidisciplinary team, and that the child be assessed in all areas related to the suspected disability. 34 C.F.R. Sec. 300.532.
 
 
 59
 The district court concluded that John's classification as an E/C student in 1985 was based on the recent diagnosis from Vanderbilt University Hospital that John suffered from schizophrenia; the matter was discussed with the Does and they agreed to the classification. More importantly, the court found that the school did not evaluate John before drawing up the initial IEP because John's fragile emotional state rendered him unable to be tested. These findings by the district court are not clearly erroneous. Thus there was no violation in this regard.
 
 
 60
 F. Failure to Consider Residential Placement
 
 
 61
 The Does' final procedural violation claim is that the school failed to consider residential placement as an alternative for John. The Federal Regulations require that the school insure that a continuum of alternative placements be available to meet the needs of handicapped children, and that such continuum must include instruction in hospitals and institutions. 34 C.F.R. Sec. 300.551.
 
 
 62
 This claim is similar to the claim made by the plaintiffs in Georgia Association of Retarded Citizens v. McDaniel, 716 F.2d 1565 (11th Cir.1983), vacated, 468 U.S. 1213, 104 S.Ct. 3581, 82 L.Ed.2d 880 (1984), adopted and modified on other grounds, 740 F.2d 903 (1984). In that case, the plaintiffs challenged the state's policy of refusing to consider or provide year-round educational programs. The court held that such a policy was contrary to the state's obligation under the EHA to provide an individualized educational program for handicapped children. The court emphasized that its decision required no more than that the state consider the need for continuous education. The holding did not impose a substantive standard on the state. Id. at 1576.
 
 
 63
 Under the reasoning of Georgia Association of Retarded Citizens, if the school board in the case before us had an inflexible policy against placing students with John's problems in residential programs, then the school would be guilty of violating the procedural safeguards provided in the EHA, i.e., the requirement of developing an individualized IEP for each child which takes into consideration a continuum of placement options, including residential placements. However, the evidence in the record does not demonstrate the existence of such a policy. The district court found that the school had a "generalized policy" against placing children in private residential schools, but it also found that the defendants had consulted with experts and determined that the Auburn schools could better provide services to meet John's particular needs. These findings are not clearly erroneous and demonstrate that the school made an individualized determination that John should not be placed in a residential educational environment. Thus, there was no procedural violation in this regard.[13]
 
 G. Conclusion
 
 64
 We affirm the district court's conclusion that with regard to all of the foregoing alleged procedural violations except parental notification, there was no violation. With regard to the alleged violation relating to parental notification of IEP meetings, we affirm the district court's conclusion that any deficiency in the notices had no impact and thus there was no violation warranting relief. Finding no merit to the Does' procedural claims, we turn to the substantive claims.
 
 VI. SUBSTANTIVE VIOLATIONS
 
 65
 In this appeal, the Does challenge the district court's finding that the educational programs offered John for the 1987-88 and 1988-89 school years met the EHA's requirement of a free appropriate public education. In order to satisfy its duty to provide a free appropriate public education to John, the state must provide personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction. Drew P. v. Clarke County School Dist., 877 F.2d 927, 930 (11th Cir.1989) (citing Jefferson County Bd. of Educ. v. Breen, 853 F.2d 853 (11th Cir.1988)), cert. denied, --- U.S. ----, 110 S.Ct. 1510, 108 L.Ed.2d 646 (1990). Among other things, the state must provide John with a setting in which he can receive an educational benefit. Id. The state is not required, however, to maximize the handicapped child's potential; rather, the state must provide the child a "basic floor of opportunity," consisting of access to specialized instruction and related services. Bd. of Educ. v. Rowley, 458 U.S. 176, 200-01, 102 S.Ct. 3034, 3048, 73 L.Ed.2d 690 (1982).
 
 
 66
 In its order, the district court articulated the correct standard for reviewing the appropriateness of an IEP. The court analyzed the Does' claim that the IEPs offered for the 1987-88 and 1988-89 school years were not appropriate, with careful attention to the Does' primary claim that John needed a residential placement. The court found:
 
 
 67
 (1) The hearing officer correctly found that the program offered to John for the 1987-88 school year provided more than de minimis educational benefits. John had completed a unit of math the summer preceding the program in question, and the program was designed to slowly increase John's time in school to a full school day by the end of the 1987-88 year.
 
 
 68
 (2) The hearing officer correctly found the proposed schedule for the 1987-88 school year would meet John's psychological needs in that it provided for John's school day to begin with a counseling session. Moreover, John's treating physician testified at the hearing that, based on his recommendations, an appropriate program could be developed at Auburn.
 
 
 69
 (3) That John does not need a residential school is supported by the testimony of psychiatrists and psychologists who examined John or his records. John's treating physician, Dr. Jenkins, made a recommendation in May 1987 that did not include the possibility of residential school placement, and he testified before the district court that an appropriate program could be developed at Auburn. Dr. Jenkins found no fault in either the 1987-88 proposed schedule or the 1988-89 schedule, other than a concern that any program must provide a certain amount of consistency. He also admitted that placement in a residential school would not prevent the possibility of future hospitalization.
 
 
 70
 (4) Brandon Hall, the residential facility where John spent part of the 1987-88 school year was an inappropriate placement for John because it did not have the facilities to deal with John's psychological and emotional needs. John was expelled from Brandon Hall because of a situation that arose, in part, from Brandon Hall's lack of a program to deal with students who are on drug therapy for mental illness and disorders.
 
 
 71
 (5) Sending John to a residential school would be counterproductive to his needs. The court noted that the nearest school that might accept John as a residential student which even approaches the full benefits sought by the Does is in Texas. Experts testified that sending John so far from his home (a fully supportive environment) would be counterproductive to his development.
 
 
 72
 (6) The 1988-89 IEP afforded substantial educational benefits in that John received tutoring in several subject matter areas and received passing grades in those areas. John is able to receive appropriate public education under the program and does not require residential school placement.
 
 
 73
 The findings of fact made by the district court are fully supported by the record and are not clearly erroneous. We affirm the court's determination that the educational programs the defendants offered to John for the 1987-88 and 1988-89 school years were reasonably calculated to provide John with educational benefits and therefore met the requirements of the EHA.
 
 
 74
 VII. SECTION 504 OF THE REHABILITATION ACT OF 1973
 
 
 75
 Section 504 of the Rehabilitation Act provides:
 
 
 76
 No otherwise qualified handicapped individual ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by an Executive agency or by the United States Postal Service.
 
 
 77
 29 U.S.C. Sec. 794 (1982). The Does contend that, within the context of education for the handicapped, section 504 should be interpreted to require affirmative action on the part of the school to provide special programs for handicapped children. Thus, they contend that the district court erred by requiring them to show intentional discrimination on the part of the school in order to support a violation of section 504. They contend that the standard for a violation of section 504 is the same as that for a violation of the EHA: whether the defendants followed the procedural requirements of the statute and whether they provided an appropriate educational program for the child. The school, on the other hand, argues that the district court correctly required intentional discrimination for a violation of section 504.
 
 
 78
 In this case, we need not address the foregoing issue.[14] Plaintiffs' section 504 claims are identical to their claims under the EHA, which we have already held are without merit. Thus, even if plaintiffs are correct in their contention that section 504 encompasses more than a proscription against discrimination, the particular claims asserted by them in this case have no merit.[15]
 
 VIII. CONCLUSION
 
 79
 For the foregoing reasons, we affirm the district court's determination that John was not denied a free appropriate public education under either the EHA or section 504 of the Rehabilitation Act of 1973.
 
 
 80
 AFFIRMED.
 
 
 
 [1]
 The EHA defines "handicapped children" as "mentally retarded, hard of hearing, deaf, speech or language impaired, visually handicapped, seriously emotionally disturbed, orthopedically impaired, or other health impaired children, or children with specific learning disabilities, who by reason thereof require special education and related services." 20 U.S.C. Sec. 1401(a)(1) (Supp.III 1985). The parties do not dispute that John is a handicapped child as defined by the EHA
 
 
 [2]
 The regulations governing implementation of the EHA are codified in 34 C.F.R. Part 300
 
 
 [3]
 Any party aggrieved by the state administrative findings and decision has the right to file suit in the United States district court. In that lawsuit, the court "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. Sec. 1415(e)(2). This court has recognized that the role of the district court is to review the administrative determinations contemplated by the EHA. Jefferson County Bd. of Educ. v. Breen, 853 F.2d 853, 857 (11th Cir.1988). The extent of deference to be given the administrative findings of fact is an issue left to the discretion of the district court. Id. The court must consider the administrative findings of fact, but is free to accept or reject them. Id. (citing Town of Burlington v. Dep't of Educ., Comm. of Mass., 736 F.2d 773, 792 (1st Cir.1984), aff'd, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985))
 
 
 [4]
 20 U.S.C. Sec. 1401(a)(19) provides:
 The term "individualized education program" means a written statement for each handicapped child developed in any meeting by a representative of the local educational agency or an intermediate educational unit who shall be qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of handicapped children, the teacher, the parents or guardian of such child, and, whenever appropriate, such child, which statement shall include--
 (A) a statement of the present levels of educational performance of such child,
 (B) a statement of annual goals, including short-term instructional objectives,
 (C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs,
 (D) the projected date for initiation and anticipated duration of such services, and
 (E) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.
 
 
 [5]
 We address only those alleged procedural violations that were fairly presented to the district court and on appeal
 
 
 [6]
 We note that there is one exception to this holding: the suspension claim. Because the plaintiffs expressly withdrew the suspension claim during the due process hearing, they have not exhausted their state administrative remedies regarding that claim
 
 
 [7]
 This court held in S-1 v. Turlington, 635 F.2d 342, 348 (5th Cir. Unit B 1981), cert. denied, 454 U.S. 1030, 102 S.Ct. 566, 70 L.Ed.2d 473 (1981), that a termination of educational services, occasioned by an expulsion of a handicapped child, is a change in educational placement, thereby invoking the procedural protections of the EHA. See also, Honig v. Doe, 484 U.S. 305, 108 S.Ct. 592, 604-05, 98 L.Ed.2d 686 (1988) (holding that Sec. 1415(e)(3), the "stay put" provision of the EHA, does not allow a school to expel a handicapped child, or suspend such child for more than 10 days, until after the due process procedures required by the EHA have been completed)
 
 
 [8]
 The Federal regulations do not require that changes in a child's program, after the initial placement, be subject to parental consent. 34 C.F.R. Sec. 300.504(b). However, the school is required to provide proper notice to parents before making changes in the child's placement and when refusing to make changes in placement. 34 C.F.R. Sec. 300.504(a). The parents may then initiate a hearing on the matter, if they are not satisfied. 34 C.F.R. Sec. 300.506
 
 
 [9]
 Because of the importance of the procedural requirements of the EHA, see Rowley, 458 U.S. at 205-06, 102 S.Ct. at 3050, and because most of the procedural requirements are designed to insure both full parental participation and thorough analysis of the various educational approaches available to meet the unique educational needs of the handicapped student, procedural violations will most often have a harmful effect. In this particular case, our careful review of the record persuades us that the procedural deficiencies claimed here have had no impact
 
 
 [10]
 We note that the per se violation argument has application in this case only to the alleged deficiencies regarding notice of IEP meetings; with regard to the other alleged procedural violations, the district court found that there was no violation
 
 
 [11]
 The court's analysis in Tice is consistent with that of other Fourth Circuit cases. See Spielberg v. Henrico County Pub. Schools, 853 F.2d 256, 259 (4th Cir.1988) (school's decision to place child at particular facility without first developing an IEP violated the procedural requirements of the EHA and denied parental involvement in the decision-making process; the violation was therefore sufficient basis upon which to hold that the school failed to provide child with a free appropriate public education), cert. denied, 489 U.S. 1016, 109 S.Ct. 1131, 103 L.Ed.2d 192 (1989); Bd. of Educ. of the County of Cabell v. Dienelt, 843 F.2d 813, 815 (4th Cir.1988) (failure to conduct a placement advisory committee meeting or otherwise adequately involve the parents in the preparation of the child's proposed IEP was a violation of the child's right to a free appropriate public education)
 It is possible that Jackson v. Franklin County School Bd., 806 F.2d 623, 628-29 (5th Cir.1986), is contrary to our holding. Citing Hall v. Vance County Board of Education, 774 F.2d 629 (4th Cir.1985), the Fifth Circuit purported to adopt the per se violation analysis. However, the court remanded to the district court for a determination of the loss caused by defendants' procedural violation, and noted that the plaintiff might be entitled to only nominal damages. Id. at 631. The Jackson holding would make no practical difference in this case, since the Does have not sought declaratory relief for the procedural violation, nor argued that the procedural violation alone would warrant attorney's fees or any other relief. See also Daniel R.R. v. State Bd. of Educ., 874 F.2d 1036, 1041, 1042-43 (5th Cir.1989) (holding that "a violation of the EHA's procedural guarantees may be a sufficient ground for holding that a school system has failed to provide a free appropriate public education," but also holding that where parents agreed with school's evaluation and refused a new evaluation, the school would not be held to violate the EHA's requirement of reevaluation).
 
 
 [12]
 See also Abney v. District of Columbia, 849 F.2d 1491, 1497-98 (D.C.Cir.1988) (failure to notify child's surrogate parent that child was being denied educational benefits violated both procedural and substantive requirements of the EHA; the plaintiff was therefore entitled to relief). Cf. Leonard by Leonard v. McKenzie, 869 F.2d 1558, 1562 & n. 3 (D.C.Cir.1989) (holding that an inadvertent clerical error in a Notice of Placement form, which incorrectly identified the school in which the child would be placed, neither violated the EHA's procedural requirements nor affected the appellants in any appreciable way)
 The Third Circuit recently declined to reach the issue of whether compensatory damages based solely on violations of a parent's procedural rights may be available under the EHA. Muth v. Central Bucks School District, 839 F.2d 113, 127 (3d Cir.1988), rev'd on other grounds, Dellmuth v. Muth, --- U.S. ----, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989). The court in Muth allowed reimbursement to the parents for out-of-pocket expenses incurred in alternate placement for their child when the IEP developed by the school was not adequate. See also McKenzie v. Smith, 771 F.2d 1527, 1535-36 (D.C.Cir.1985) (also allowing reimbursement to parents for placement of child in residential school where such placement was appropriate, the defendant school had failed to provide an adequate placement for the child, and where the defendant school was largely responsible for the delay in review proceedings).
 The court in Muth noted that there is case law suggesting that damages based solely on violations of a parent's procedural rights may be available under the EHA, citing Hall and Jackson v. Franklin County School Board, 806 F.2d 623, 629 (5th Cir.1986). Muth, 839 F.2d at 127 n. 15. The court added, however, that in both of those cases, the school not only violated procedural requirements but also provided an inappropriate IEP. "It has not yet been held ... that procedural violations in and of themselves will justify an award of tuition reimbursement where a parent unilaterally decides to place his child in private school during the pendency of the due process proceedings and where the IEP offered by the public school for the period at issue is ultimately determined to be appropriate." Id.
 
 
 [13]
 Furthermore, as is discussed more fully below, both the state hearing officer and the district court determined that removing John from his home and placing him in a residential school would not be appropriate for the child
 
 
 [14]
 See Smith v. Robinson, 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984); Rogers v. Bennett, 873 F.2d 1387 (11th Cir.1989); Georgia State Conference of Branches of NAACP of Georgia, 775 F.2d 1403 (11th Cir.1985); Georgia Ass'n of Retarded Citizens v. McDaniel, 716 F.2d 1565 (11th Cir.1983), vacated, 468 U.S. 1213, 104 S.Ct. 3581, 82 L.Ed.2d 880 (1984), modified, 740 F.2d 902 (1984); Manecke v. School Bd. of Pinellas County, Fla., 762 F.2d 912 (11th Cir.1985)
 
 
 [15]
 The plaintiffs do not contend on appeal that the district court was clearly erroneous in its finding that there was no intentional discrimination against John